Filed 12/14/21  In re M.M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re M. M. et al., Persons Coming Under the Juvenile Court Law. | C093836 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. Nos. JV2018535, JV2018536, JV2018537, JV2018538, JV2019300 ) |
| Plaintiff and Respondent, | |
| v. | |
| H. M., | |
| Defendant and Appellant. | |

H. M., mother of the minors Ma., J., Me., K., and Mh., appeals from the juvenile court's order terminating her parental rights and freeing the minors for adoption.  (Welf. & Inst. Code,[1] § 366.26.)  Mother contends the court erred when it found the beneficial

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

1

parental relationship exception did not apply as to Ma. and J. (§ 366.26, subd. (c)(1)(B)(i).) In addition, mother argues Yolo County Health and Human Services Agency (the Agency) did not provide proper notice pursuant to the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.) Finally, mother requests we relieve minors' counsel from representing all five minors in any subsequent proceedings. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I

*Initial Detention*

In October 2018, the Agency filed dependency petitions for minors Ma., J., Me., and K.[2] pursuant to section 300, subdivision (b)(1).[3] The petitions alleged the parents had failed to: (1) adequately supervise or protect the minors; and (2) supervise the minors adequately from the conduct of the custodian with whom the minors were left. Specifically, the petition alleged the minors were at substantial risk of physical and emotional harm due to the failure of the mother and father[4] to protect the minors from exposure to domestic violence. In September 2018, the minors witnessed mother engage in a "semi" physical fight with mother's boyfriend W. (the boyfriend), and the minors ran to get someone to call 911. In October 2018, Ma. and J. disclosed they had seen and heard mother and mother's boyfriend engage in verbal and physical fights. Mother told J. that the boyfriend had twisted her arm in October 2018, and Ma. saw the boyfriend choke

---

[2] Mh. was not yet born at the time of these petitions. Given mother's contentions, we will limit our discussion of the events leading up to the termination of parental rights as to Mh.

[3] At the time of detention, Ma. was seven years old, J. was six years old, Me. was four years old, and K. was a year old.

[4] "Father" refers to the father of Ma., J., Me., and K. Father and mother were married, but father's whereabouts were unknown at the time of the petition.

2

mother and was afraid of him. In October 2018, mother refused to engage in safety planning with the Agency and stated she was "not going to 'turn her back' " on the boyfriend because he provided for her and helped with the minors.

In addition, mother said she and the father of Ma., J., Me., and K. (father) argued while they were in a relationship, including one occasion which resulted in father being sent to jail for domestic violence while he was under the influence of alcohol. Father had an extensive criminal background, including several arrests for inflicting corporal injury on a spouse/significant other, assault with a deadly weapon, and public intoxication.

With respect to ICWA, mother reported she had no known Indian heritage. Mother reported she was unsure if father had Indian heritage. In October 2018, father filed a Judicial Council of California ICWA-20 form and reported he might have Indian ancestry and identified the Northern Sioux, Apache, and Cherokee tribes. No further information was provided.

In the October 2018 detention report, the Agency recommended the minors be detained from the parents. According to the report, Ma. said the boyfriend had broken mother's arm, and had hurt her before. Ma. noticed that mother and the boyfriend fought in the evening, after the boyfriend drinks alcohol. Ma. was scared of the boyfriend. Ma. said she normally took all the kids into the bathroom when mother and the boyfriend fight. Similarly, J. said mother and the boyfriend argued, and J. had seen them push each other. Mother admitted to arguing with the boyfriend but denied that he broke any bones. The social worker observed bruises on mother's arm. Police had also been called for a different domestic violence incident in September 2018. The boyfriend had strangled mother so hard that she could not breathe for 30-60 seconds, and she suffered visible injuries. Mother said father had a substance abuse issue and was homeless. Mother declined to engage in safety planning with the Agency or go to a shelter, even though she was warned this would cause the Agency to seek the removal of the minors from her

3

care.  After the minors were removed from mother's care, a social worker noticed a burn mark on K.'s bottom and significant diaper rash.  Mother made excuses for K.'s injury.

The court ordered the minors detained and sustained the petitions in October 2018. The court ordered reunification services for mother and father.

## II

### *Jurisdiction And Disposition*

In the November 2018 disposition report, the Agency recommended family reunification services for mother and father.  With respect to ICWA, mother and now father said they did not have Indian heritage.  After holding a contested disposition hearing in December 2018, the court ordered reunification services for mother and father. The court also found that mother had made "minimal" progress toward alleviating or mitigating the causes necessitating placement.  The court found ICWA did not apply.

In a March 2019 status review report, the Agency recommended continued out-of-home placement and continued reunification services for mother and father.  The minors were doing well in their current placement.  Mother was actively participating in counseling services and crossover services.  Visits were going well, but mother missed several visits due to transportation issues and illness.  Still, mother had maintained contact with the boyfriend and had been letting him stay at her home.  Father had also been staying with mother.  During an interim hearing in March 2019, the court found mother had made adequate progress toward alleviating or mitigating the causes necessitating placement.  The court ordered continued reunification services and set the matter for a six-month review hearing in June 2019.

## III

### *Six-Month Review Hearing*

In a May 2019 status review report, the Agency recommended continuing out-of-home care and reunification services for mother and father.  The minors were doing well in their current placement.  Mother was attending therapy sessions.  Still, mother was

4

pregnant and remained in a relationship with the boyfriend, who also continued to stay with mother. In February 2019, mother had called police due to a dispute with the boyfriend while he was at her home. In February 2019, mother said she no longer had contact with the boyfriend. In March 2019, mother denied being in a relationship with the boyfriend but wanted him to attend the prenatal doctor appointments. Mother then told the social worker that the pregnancy was planned with the boyfriend. In April 2019, mother again told the social worker that she did not want a relationship with the boyfriend, and said she would seek a protective order. A few days later, she told the social worker that she wanted to coparent with the boyfriend. In April 2019, police were called twice to address separate incidents between mother and the boyfriend. In the first incident, the boyfriend broke mother's bedroom door, entered the bedroom, ate a snack, and then left the home. When mother tried to shut the front door behind him, the boyfriend overpowered mother and shoved his way back inside. Maternal grandmother contacted police. In the second incident, the two argued as to who had fathered the unborn baby. The boyfriend got so mad that he hit mother 20 times over the course of an hour. Eventually mother was able to escape the home. Mother told the officer that the boyfriend had hit her before, and she feared the boyfriend would eventually kill her. But she refused an emergency protective order. The responding officer saw visible injuries to mother's face and neck, and mother reported pain in her legs. By May 2019, mother still had not obtained a protective order, and the boyfriend continued to attend prenatal appointments. When talking to the social worker, mother denied the incidents in April. She then claimed she had taken the police report to the temporary protective order hearing in May 2019, but the court records showed she had not been present at the hearing, and no protective order was issued. Later that month, criminal charges of spousal abuse were filed against the boyfriend (Pen. Code, § 273.5, subd. (a)) and a protective order was granted in favor of mother. Mother later said she wanted to terminate the protective order and said she did not feel threatened by the boyfriend. The

5

Agency expressed concerned about mother's ability to protect the minors, especially since she had repeatedly been dishonest with the Agency and had continued a relationship with the boyfriend despite the domestic violence.

During the June 2019 hearing, the minors' counsel objected to extending services and asked the court to set a section 366.26 hearing. Counsel argued mother had not made progress, given that she continued to have a relationship with the boyfriend despite the ongoing instances of domestic violence. The minors were all under the age of eight years and were too young to be able to protect themselves from the boyfriend. The court agreed and set the matter for a contested six-month review hearing in July 2019.

In a July 2019 addendum report, the Agency recommended that reunification services be terminated for mother and father, and that the court set a section 366.26 hearing. Mother had continued her involvement with the boyfriend, even though she scored at a "Severe Danger" level on a lethality assessment. In July 2019, the boyfriend was supposed to give mother a ride to work, but instead dropped her off at the side of the road and took her cell phone. Although mother claimed to have ended things with the boyfriend and changed the protective order to be no contact, she also helped the boyfriend post bail and emailed a local employment agency seeking help in getting the boyfriend a new job. The Agency stated mother lacked insight into the domestic violence, and her behavior indicated she intended to remain in contact with the boyfriend, despite telling the social worker otherwise.

After holding a contested hearing in July 2019, the court terminated reunification services for mother and father and set a section 366.26 hearing in November 2019. The court reasoned that mother had failed to show insight regarding her relationship with the boyfriend. The court found mother not credible when she testified that she had a change of heart. Her life was intertwined with the boyfriend, and she continued to engage with him, despite the severe lethality assessment. In sum, although she had successfully visited with the minors, mother had not made significant progress in her case plan.

Father, who had been in custody since January 2019, similarly had not made significant progress in his case plan. The court ordered continued visitation for mother.

IV

*Detention Of Mh.*

Mh. was born in September 2019, and the Agency detained and filed a dependency petition for her within a week of her birth, pursuant to section 300, subdivisions (b)(1) and (j). The boyfriend was alleged to be Mh.'s father. The petition alleged Mh. was at substantial risk of physical and emotional harm due to the inability of mother to protect her from being exposed to domestic violence. In addition to the above-noted incidents of domestic violence between mother and the boyfriend, the petition also alleged that, in August 2019, the boyfriend broke into mother's home and assaulted her, causing visible injuries. Mother refused medical treatment, even though she was pregnant. In addition, the boyfriend had called, texted, and shown up at her workplace. Although mother did not respond, she failed to contact police, even though she had an existing protective order. The boyfriend also had lived with mother in June 2019. The court ordered Mh. detained and set a contested jurisdiction and disposition hearing for Mh. in December 2019, combined with a section 366.26 hearing for the other minors.

In the November 2019 disposition report, the Agency recommended no reunification services for mother or the boyfriend (who was Mh.'s alleged father). With respect to ICWA, the boyfriend told the social worker he had no known Indian heritage. Mother similarly filed a parental notification of Indian status form (ICWA-20) stating she had no Indian heritage. Mother said she had found a new apartment and would not be giving the address to the boyfriend. The boyfriend was currently incarcerated. Mother was participating in individual counseling services and a domestic violence support group. Mother's clinician described mother as "open and willing to explore issues," and said she "accepts responsibility." Still, the Agency stated that mother "has failed to make the necessary behavioral changes to provide safety and protection of her children."

7

Although mother had called police regarding the most recent domestic violence incident with the boyfriend, she had failed to recognize the boyfriend's concerning behaviors leading up to the incident, including stalking. Mother had also not been forthcoming or truthful about her relationship with the boyfriend, and she "d[id] not seem to grasp the severity of the domestic violence, and the related safety concerns associated with domestic violence."

V

*First Section 366.26 Hearing And Section 388 Petition*

In its November 2019 section 366.26 report, the Agency recommended termination of parental rights and adoption for the minors. All five minors (Ma., J., Me., K., and Mh.) were placed in the same foster home, and the family was interested in adopting them. The minors were doing well in the placement and had "become an integral part of the household and family." The four older minors had been placed there since January 2019. They were "comfortable" and "well-adjusted." The Agency said the minors were likely to be adopted by the foster parents. Ma., J., and Me. said if they were unable to return to mother's care, they would like to be adopted. Ma. and J. understood why they were unable to return to mother's care and said they would like to continue to have postadoption contact with mother. K. was too young to talk about placement, but she seemed to have a positive attachment to the foster parents.

Mother had visited with the minors "as much as possible," although she had difficulty with transportation. The minors said they enjoyed spending time with mother. The foster mother said that the minors are sometimes cranky and tired after visits with mother. The Agency recommended reduced visitation for mother. The foster family was willing to continue contact with mother postadoption.

In November 2019, mother filed a section 388 petition requesting family reunification services or family maintenance services. Her individual counseling and group sessions had helped her better understand domestic violence. She feared the

8

boyfriend and was in the process of moving and changing her phone number. She was also cooperating with the prosecutor regarding the boyfriend's domestic violence case. She was employed and had renewed family support. Her weekly visits with the minors for six hours total were "wonderful." She and the minors had a "very special bond," and she believed it was in the minors' best interest to be returned to her care or in the alternative to offer reunification services.

In December 2019, after holding a contested hearing, the court found there were changed circumstances and granted mother's section 388 motion. In addition to cooperating with the prosecution and participating in domestic violence counseling, mother demonstrated insight into domestic violence during her testimony. Also, mother had no history of substance abuse, and her relationship with minors was positive and emotionally healthy. Further, the minors' caregiver had expressed support for the mother. The court ordered reunification services and visitation for mother. Still, the court expressed concern that mother could care for all five minors, given her pattern of depending on a man for support rather than working. The court encouraged mother to find support within her family rather than a man. The court found father was not a presumed father for Mh. The father was scheduled to be released from custody and the court ordered visitation.

During the hearing, mother confirmed that none of the minors had Indian heritage. Father informed the court for the first time that his grandmother was Cherokee and was a tribal member. Given the court's finding on Mh.'s parentage, the court found ICWA did not apply to Mh.

VI

*Eighteen-Month Review For The Four Older Minors*

In a March 2020 report, the Agency recommended ending reunification services for mother. In January 2020, the boyfriend had been sentenced to six years in state prison for burglary (Pen. Code, § 459) and felony injury to a spouse, cohabitant, or fellow parent

9

(Pen. Code, § 273.5, subd. (a)). Mother had moved into a new apartment and was actively engaged in services, including individual counseling, a domestic violence support group, and parenting classes. Visitation with the minors was going well, although, at mother's request, visits had switched to video visits due to the COVID-19 pandemic. Mother had let father stay with her for a few nights after his release from prison in February 2020. Mother told the social worker he was not living with her. In March 2020, the Agency learned mother was pregnant again (neither father nor the boyfriend were the unborn baby's father). Mother said she had not planned on telling the Agency about her new pregnancy, since it "did not affect" the minors. She said she was not in a relationship with the unborn baby's father (or anyone else), but she did plan to coparent the unborn baby with him. The social worker was concerned about mother's lack of honesty with the Agency.

With respect to ICWA, the social worker spoke with father in the courtroom at the end of the December 2019 hearing. He said he did not know who in his family had Indian heritage, but he would call his family to get more information. He thought it was his great-grandmother, but he did not know her name. The social worker sent father an ICWA-20 form in December 2019, but she did not hear back from him. In January 2020, the social worker contacted mother, who said the father had received the form but had to call his aunt to get information about the family. In January 2020, a social worker left a voice mail with a paternal uncle to ask about the family's Indian heritage and asked him to call her back. In February 2020, father's aunt told a social worker that her father's mother was Cherokee. However, she did not know what tribe or what her grandmother's name was. Father's aunt promised to look into it further.

In May 2020, the court granted father's section 388 petition and ordered reunification services. In his petition, father suggested he hoped the family would "be together again with the children[,] mom and dad." The court continued the review

10

hearing and noted there would be a child family team meeting to discuss a 90-day transition plan to mother.

In its June 2020 report, the Agency recommended ending reunification services for the mother and asked the court to set a section 366.26 hearing. Although mother and father both denied being in a relationship, they had terminated the existing protective order and remained married. In addition, father told his parole officer that his residence was at mother's address, although he later said that was untrue. Mother and father denied any history of domestic violence, although mother later admitted to an incident in 2013. There had actually been three police reports documenting domestic violence between father and mother where the minors were present (two in 2013 and one in 2017), and the social worker expressed concern that mother was not being truthful. Given their minimal progress and apparent intention to reunite, the Agency believed it would be detrimental to return the minors to mother or father. The minors were young and vulnerable, and they had already witnessed domestic violence.

In June 2020, the court set the matter for a contested 18-month and six-month review in July 2020. Later that month, the Agency filed a section 388 petition requesting the court end father's reunification services.

In a July 2020 report, the Agency noted that mother had given birth to her sixth child S. Mother did not tell the Agency about S.'s birth but the Agency found out from the foster parents. S. was detained because his meconium test was positive for cocaine, suggesting mother had ingested illegal substances during her pregnancy. The court took jurisdiction over S. in August 2020. Mother told the social worker she had used cocaine when Mh. was removed from her care, and she later testified during a hearing that she used cocaine multiple times a week from September 2019 through January 2020. Father had been seen at mother's home and appeared to be under the influence, and mother suspected substance abuse issues.

11

After holding a contested hearing in July 2020, the court terminated reunification services for mother and father. The court reasoned that, although mother cared for the minors, they were still at substantial risk due to mother's lack of awareness and dangerous decisions. The court set a section 366.26 hearing for November 2020. The court ordered continued visitation for mother of six hours per week.

VII

*Second Section 366.26 Hearing*

In its November 2020 report, the Agency recommended terminating parental rights and freeing all five minors for adoption. The five minors remained in the same foster home (with the four oldest having been there since January 2019 and Mh. joining the family in September 2019) and had "adjusted well." They were "comfortable" and "an integral part of the household and family." The environment was "stable and nurturing, with caregivers who are attentive and responsive to their needs." The caregivers "shower[ed the minors] with love." An assessment by the Department of Social Services Adoptions Branch found the five minors were likely to be adopted. The prospective adoptive parents were suitable, held the minors "as their own," and were committed to adopting all five minors. The three oldest minors said they would like to return to mother's care but understood why that was not possible. They also said they would like postadoption contact with mother. Ma. said she wanted to be adopted, and Me. said through tears that she would like to be adopted by the potential adoptive parents if she could not return to mother's care. Mh. and K. were too young to express an understanding of adoption but they appeared to "have a positive attachment to the potential adoptive parents." The potential adoptive parents were open to having postadoption contact with mother, father, and extended family.

Mother continued to visit regularly with the minors virtually, for six hours a week, as well as participate in phone calls three evenings per week. The visits went well,

12

although there had been some technical difficulties. The Agency asked that visitation be reduced, in order to help the minors transition to adoption.

With respect to ICWA, father's aunt told the social worker in March 2020 that she had learned her grandmother's last name was M. (no first name was provided) but she had been unable to confirm her grandmother's tribe. In June 2020, the social worker helped father complete an ICWA-30 form. The Agency later filed these forms for the four older minors (Ma., J., Me., and K.) in October 2020. The forms contained information about the minor, mother, father, and paternal grandmother, but there was no mention of the paternal great-aunt's grandmother. The forms also stated that the minor might be eligible for membership in the Cherokee tribe, although the third page listed potential Cherokee ancestry under mother's information rather than the father's. The form was sent to the Bureau of Indian Affairs in Sacramento and the federal Bureau of Indian Affairs (BIA), the Eastern Band of Cherokee Indians, and the United Keetowah Band of Cherokee.

In October 2020, the Agency received an email from a representative of the Cherokee Nation stating that the minors were not enrolled or eligible for enrollment. The tribe would send the Agency a formal written response within 90 days. Later that month, the Agency spoke via telephone with a representative in the enrollment department of the United Keetowah Band of Cherokee, who said the minors were not enrolled or eligible for enrollment. Later that month, the Agency spoke via telephone with a representative in the enrollment department of the Eastern Band of Cherokee Tribe, who said the minors were not enrolled or eligible for enrollment.

During the January 2021 contested hearing, the court found ICWA did not apply. The court reasoned the Agency had made diligent efforts to contact the relevant tribes and had received negative responses about the minors' enrollment or eligibility to enroll.

Dr. Donald Siggins, a licensed psychologist and marriage and family counselor, testified as an expert on bonding assessments. He evaluated mother and the minors in

October 2020, including a three-hour supervised visit in September 2020. In his opinion, the minors were "well-bonded" and "attached" to their mother. When K., Me., and J. saw mother, they were excited and ran to her and hugged her. The minors and mother had a "lot of fun" during the visit and did not want to leave at the end. Dr. Siggins was aware the plan was to keep the five minors together and he warned there was a risk of detriment to K. if she was separated from her siblings. In his opinion, adoption for the three younger minors (Me., K., and Mh.) would not be detrimental. However, he was of the opinion that it would be detrimental for the two older minors (Ma. and J.). Ma. and J. had a greater bond with mother because they were older and had helped mother care for their younger siblings. In addition, they believed they would spend more time with mother after the adoption, and Dr. Siggins feared they would feel betrayed if that was not possible. Although they both had "a lot of coping skills," Dr. Siggins feared Ma. and J. would be "mad" and "distressed" by adoption, causing future psychological impact. Dr. Siggins stated adoption was not in Ma. and J.'s best interests and the two would benefit from a long-term guardianship. In addition, it was in the minors' best interest to continue contact with mother, such as through an "open" adoption.

During cross-examination, Dr. Siggins agreed the minors needed permanency and a relationship with a parent. Ultimately, Dr. Siggins could not conclude that it would be detrimental for any of the minors to be adopted. Ma. and J. might be "depressed" but they would not suffer long-term concerns because they had a close bond with their siblings and an ability to endure and adapt. He also was unable to conclude that the minors' relationship with mother promoted their wellbeing to such a degree that it outweighed the benefits they would have of being adopted.

Mother testified she had only virtual visits with the minors since March 2020, except for the September 2020 in person visit with Dr. Siggins. She had obtained a protective order against father in December 2020.

14

The social worker testified that, although terminating parental rights is difficult for any child, she believed adoption was in the minors' best interests. Adoption would provide more structure than guardianship and would protect the minors from mother's inability to follow boundaries. For example, mother continued allowing father to stay in her home in September 2020, and police were called to remove father. In addition, it would also be confusing for the five minors to grow up together in the same home with only two of them having a guardianship relationship with mother. The social worker believed it was "essential" for the minors to maintain contact with mother and she understood the prospective adoptive parents intended to do so. She believed the prospective adoptive parents loved the minors "unconditionally" and would act in their best interest going forward.

During closing argument, mother argued the beneficial relationship exception applied only as to the two older minors (Ma. and J.). She noted Ma. and J. were excited to see mother during their September 2020 visit and ran up to mother and hugged her. They also wanted more time with mother and it would be harmful for them if this did not happen after adoption. According to mother's counsel, guardianship would be more appropriate for Ma. and J.

The court found by clear and convincing evidence that all five minors were adoptable and that the beneficial parental relationship exception did not apply. The court ordered parental rights terminated with a permanent plan of adoption. In reaching its findings, the court found that mother had maintained regular visitation and contact with the children.

The court then considered whether the benefit of maintaining the parent-child relationship outweighed the benefits of adoption. The court noted it was not taking into account any potential postadoption contact. The court found the minors had a positive relationship with mother and that mother loved minors. In addition, the two older minors indicated they wanted to maintain a relationship with mother. Still, it did not appear that

15

the two older children had an "exceptionally strong" relationship with mother. The court identified the minors' need for permanence as a very important factor. The court was concerned by mother's lack of progress with the substance abuse and domestic violence issues that led to the underlying petition, especially mother's failure to fully address her substance abuse. Finally, the court found it important to maintain the sibling group together. Mother had requested that the beneficial parental relationship apply only to the two oldest minors but the court feared this would result in uncertainty as to where Ma. and J. would live and who would take care of them. In addition, all five siblings might fear being split up in the future. In the end, the court saw a "great need for permanence" for the minors. Mother's lack of significant progress did not make it likely that future interaction would be beneficial.

DISCUSSION

I

*Beneficial Parental Relationship*

Mother contends the juvenile court erred in failing to find the beneficial parental relationship exception to adoption applied to the two oldest minors (Ma. and J.). Despite the court's detailed explanation of the multiple factors it considered in making its decision, mother points to the court's comment that, "I think perhaps the deciding factor, however, that's going to cause me to deny the exception and to terminate parental rights is that I don't see the progress made by Mother as so significant that it would make it likely that future interactions would be beneficial. In other words, I have great concerns that the substance abuse issues are still there and they would color any future relationship." Citing *In re Caden C.* (2021) 11 Cal.5th 614, mother argues this statement demonstrates that the court abused its discretion and improperly declined to find that the beneficial parental relationship exception applied solely because of her ongoing substance abuse issues, when it otherwise had found that mother had satisfied her burden. Mother's contentions are without merit.

16

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when the parents have maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)

To prove that the beneficial parental relationship exception applies, the parent must show there is a significant, positive emotional attachment between the parent and child. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) The parent must also prove that the parental relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, at p. 575.) On the other hand, when the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent/child

relationship, the court should order adoption. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 633-634; *Autumn H.*, at p. 575.) A parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the beneficial parental relationship exception. (*Caden C.*, at p. 637.)

The beneficial parental relationship exception to adoption is an exception to the general rule that the court must choose adoption where possible, and it " 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) It "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) The factual predicate of the exception must be supported by substantial evidence but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-640; *In re K.P.* (2012) 203 Cal.App.4th 614, 622.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Caden C.*, at p. 641.)

Here, the evidence supports the court's finding that the beneficial parental relationship exception did not apply. Mother maintained regular visitation and contact with Ma. and J., but she failed to establish that they had such a significant, positive emotional attachment to her such that they would benefit from continuing that relationship or be significantly harmed should the attachment be severed, especially when balanced against the benefit of an adoptive home. (See *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) By the time of the section 366.26 hearing, Ma. and J. had

spent nearly two years with their prospective adoptive family. They were "comfortable" and an "integral part of the household and family," indicating their strong bond with the family.

Although Dr. Siggins reported that he observed the minors having a "lot of fun" during their visit with mother and indicating they wanted more time with mother, it is not enough for a parent to show frequent and loving contact during pleasant visits, as mother did here. (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555.) Neither a loving relationship (*In re Jeremy S*. (2001) 89 Cal.App.4th 514, 523) nor the derivation of some benefit from continued parental contact (*In re Angel B*. (2002) 97 Cal.App.4th 454, 466) is enough to establish the beneficial parental relationship exception to adoption. Although Ma. and J. may have formed a bond with mother and might be sad if their relationship was terminated, as the social worker testified, terminating parental rights is difficult for any child. Moreover, Dr. Siggins opined the two would ultimately not suffer long-term consequences because they had a close bond with their siblings and an ability to endure and adapt. As the trial court noted, adoption would provide stability because it would ensure Ma. and J. could remain together with their siblings.

Given the ample additional reasons the trial court cited in reaching its decision, it did not err in also noting that mother had not made enough significant progress in addressing her substance abuse to make it likely that future interaction with her would be beneficial for Ma. and J. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 637-638 [although a parent's failure to overcome the circumstances leading to dependency are not a categorial bar to applying the beneficial parental relationship exception, it is still relevant because it "speak[s] to the benefit (or lack thereof) of continuing the relationship"].) In sum, the juvenile court did not err in finding the beneficial parental relationship exception did not apply.

19

## II

### *Indian Child Welfare Act*

Mother argues the Agency did not provide proper notice pursuant to ICWA. Despite father's further representations to the social worker and the court, mother contends the Agency was obligated to mail ICWA-30 notices regarding the four oldest minors (Ma., J., Me., and K.) to the Northern Sioux, Apache, and all three Cherokee tribes[5] based on father's representation in his October 2018 ICWA-20 form that he might have heritage in those tribes.[6] Mother further contends the forms erroneously excluded information concerning maternal grandmother and erroneously stated that father's tribe or band was unknown and that mother's was Cherokee. Mother's contentions are without merit.

## III

### *ICWA Requirements And Standard Of Review*

"The Agency and the juvenile court have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048.) Under section 224.2, subdivision (b), the duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child."

In addition, further inquiry regarding the possible Indian status of the child is required when "the court, social worker, or probation officer has reason to believe that an

---

[5] The forms were sent to the Eastern Band of Cherokee Indians and the United Keetowah Band of Cherokee, but not the Cherokee Nation.

[6] Mother also contends the Agency did not send notices for J. or K. We note that the record was supplemented after mother filed her opening brief with copies of the ICWA-30 form notices that were sent for J. and K. Regardless, given our conclusions, mother's contentions of error are without merit.

Indian child is involved in a proceeding but does not have sufficient information to determine that there is reason to know that the child is an Indian child." (§ 224.2, subd. (e).) "The Legislature, which added the 'reason to believe' threshold for making a further inquiry in 2018, did not define the phrase. When that threshold is reached, the requisite 'further inquiry' 'includes: (1) interviewing the parents and extended family members; (2) contacting the BIA and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership of eligibility in a tribe.' " (*In re Austin J.* (2020) 47 Cal.App.5th 870, 883.)

Formal notice to Indian tribes such as via the ICWA-30 form is required only when " 'the court knows or has reason to know that an Indian child is involved.' (25 U.S.C. § 1912(a); see also . . . § 224.3, subd. (a) [if 'the court, a social worker, or probation officer knows or has reason to know . . . that an Indian child is involved' in the dependency proceeding, 'notice shall be sent to the [child's] parents or legal guardian, Indian custodian, if any, and the child's tribe']; Cal. Rules of Court, rule 5.481(b)(1)." (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 884.)

Although father informed the court and the Agency in October 2018 via the ICWA-20 form that he might have Indian ancestry and identified the Northern Sioux, Apache, and Cherokee tribes, in November 2018 he told the social worker that he had no Indian heritage. As such, the Agency had no reason to believe, let alone know, that the minors had Indian heritage, and there was no obligation to provide notice to any tribe pursuant to section 224.3.

When father told the court during the December 2019 hearing that his grandmother was Cherokee and was a tribal member, the court and Agency again had a reason to believe the four oldest minors might have Indian heritage, and therefore a duty to investigate further pursuant to section 244.2, subdivision (e). In line with its duty, the Agency asked father for more information, and he clarified that he did not know who in

21

his family had Indian heritage, although it might have been his great-grandmother. The Agency then followed up with father, a paternal uncle, and a paternal great-aunt. The paternal great-aunt was able to say only that her father's mother was Cherokee, but she did not know which tribe, and she knew only the individual's last name. This limited information was not enough to trigger a reason to know that the minors were Indian children, especially since father was unsure as to who in the family had Indian heritage. The Agency continued to investigate and contacted the BIA, the appropriate state department, and the three Cherokee tribes to inquire about the minors' enrollment and eligibility to enroll. Given the tribes' responses that the minors were neither enrolled members nor eligible to enroll, there was no reason for the Agency to know that minors were Indian children. As such, the notice requirement of section 224.3 was never triggered. Given that it had no duty to send formal notice to the tribes, we cannot say that the Agency failed in its obligation to do so.

Given our conclusions, we need not consider mother's request to relieve minors' counsel from representing all five minors in any subsequent proceedings.

DISPOSITION

The juvenile court's order is affirmed.

/s/
Robie, Acting P. J.

We concur:

/s/
Mauro, J.

/s/
Renner, J.

22